**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| ROBERT EVANS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COOKEVILLE REGIONAL MEDICAL CENTER,<br><br>Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

Plaintiff Robert Evans ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through undersigned counsel, brings this Class Action Complaint against Defendant Cookeville Regional Medical Center ("CRMC" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action on behalf of himself and approximately 337,917 other individuals who had their sensitive personal and medical information—including but not limited to—names, addresses, dates of birth, Social Security numbers (SSN), driver's license numbers, financial information, and other personally identifiable information ("PII"), as well as medical treatment information, medical record numbers, and/or health insurance policy information, and other protected health information ("PHI") (collectively, "PII/PHI" or "Personal Information") disclosed to unauthorized third parties during a data breach compromising CRMC's systems in July 2025 (the "Data Breach").

2. Defendant CRMC is a healthcare provider headquartered in Cookeville, Tennessee. CRMC operates a 269-bed regional referral center that provides a wide range of medical services, including emergency care, inpatient and outpatient treatment, surgical services, diagnostic imaging, cardiovascular care, oncology, and other specialty services.[1] CRMC serves a large, geographically diverse patient population across the Upper Cumberland region of Tennessee and surrounding areas and, upon information and belief, individuals traveling from outside Tennessee for specialized or emergency care.

3. On or about April 14, 2026, CRMC reported that it experienced a cybersecurity incident whereby "an unauthorized third party accessed CRMC's computer network and viewed and/or acquired certain files between July 11, 2025, and July 14, 2025."[2] According to the Notice published on CRMC's website, upon discovering the incident, "CRMC promptly began an internal investigation, worked to secure its systems, and notified law enforcement. CRMC also engaged a forensic security firm to assist with its investigation and ensure the security of its computer network."[3]

4. CRMC claims that it completed its investigation on or about March 16, 2026. CRMC's investigation determined that the Personal Information compromised and accessed by unauthorized third parties in the Data Breach include names, addresses, dates of birth, Social Security numbers (SSN), driver's license numbers, financial information, medical treatment information, medical record numbers, and/or health insurance policy information of approximately 337,917 individuals.[2]

---

[1] Cookeville Reg'l Med. Ctr., *About*, https://crmchealth.org/about/ (last visited Apr. 23, 2026).
[2] CRMC, *Data Breach Notification*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/fb04ea66-92bb-4a15-b02c-8d1a9f783461.html (last visited Apr. 23, 2026).

5. Despite learning of the Data Breach as early as July 14, 2025, CRMC did not publicly announce the Data Breach until approximately nine months later, in or around April 2026, and did not begin sending out Data Breach notification letters to affected individuals until around that time.

6. CRMC provides scant detail about the Data Breach and the steps that CRMC is taking to address it. It merely stated that it "has taken, and is taking, additional steps to help reduce the likelihood of a similar event from happening in the future, including by enhancing its technical security measures."

7. Defendant's failures to ensure that its servers and systems were adequately secure jeopardized the security of Plaintiff's and Class members' Personal Information, exposed Plaintiff and Class members to fraud and identity theft or the serious risk of fraud and identity theft, and lead to third parties accessing highly sensitive PII/PHI.

8. As a result of Defendant's conduct and the resulting Data Breach, Plaintiff and Class members' privacy has been invaded, their Personal Information is now in the hands of criminals, and they now face an imminent and ongoing risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## PARTIES

9. Plaintiff Robert Evans is a citizen of the state of Tennessee and resides in Putnam County, Tennessee. Plaintiff Evans has paid for and received medical treatment and health related services from Defendant. Believing Defendant would implement and maintain reasonable security practices to protect his PII/PHI, Plaintiff Evans provided his PII/PHI to Defendant as a condition of receiving medical treatment and health related services. As a result of Defendant's conduct,

Plaintiff Evans has suffered actual damages including, without limitation, incurring time and expenses related to monitoring his financial accounts for fraudulent activity, facing an increased and imminent risk of fraud and identity theft, the lost value of his Personal Information, and other economic and non-economic harm. Plaintiff Evans will now be forced to expend additional time to review his credit reports and monitor his financial accounts and medical records for fraud or identity theft.

10. Defendant Cookeville Regional Medical Center is a corporation organized under the laws of Tennessee with its principal office located at 1 Medical Center Blvd, Cookeville, Tennessee 38501. CRMC is a regional healthcare provider of a wide range of medical services, including emergency care, inpatient and outpatient treatment, surgical services, diagnostic imaging, cardiovascular care, oncology, and other specialty services.[3] CRMC serves a geographically diverse patient population, including individuals from multiple counties and, upon information and belief, individuals traveling from outside Tennessee for specialized or emergency care.

## **JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00), there are in excess of 100 Class members, the action is a class action in which one or more Class members are citizens of states different from Defendant.

[3] *About*, Cookeville Reg'l Med. Ctr., https://crmchealth.org/about/ (last visited Apr. 23, 2026).

12. The Court has personal jurisdiction over Defendant because it conducts substantial business in Tennessee, operates in Tennessee, and otherwise has sufficient minimum contacts with and intentionally avails itself of the markets in the state of Tennessee.

13. Venue properly lies in this judicial district because, *inter alia,* Defendant transacts substantial business, has agents, and is otherwise located in this district; and a substantial part of the conduct giving rise to Plaintiff's and Class members' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### *Defendant Collects and Stores Personal Information*

14. Defendant routinely collects, stores, and maintains vast quantities of highly sensitive personally identifiable information ("PII") and protected health information ("PHI") from current and former patients and other individuals in relation to providing medical treatment and health related services.

15. Through its website and patient-facing materials, CRMC holds itself out as a trusted healthcare provider that respects patient confidentiality and complies with privacy and data security obligations.

16. The Notice of Privacy Practices available on CRMC's website describes the ways in which CRMC may use and disclose medical information, as well as CRMC's obligations regarding the use and disclosure of medical information. It states, in part that:

> "[CRMC] respect[s] the confidentiality of your health information and recognize that information about your health is personal." We are committed to protecting medical information about you and to informing you of your rights regarding such information. We create a record of the care and services you each time you receive care at CRMC. This protected health information generally includes information that we create or receive that identifies you and your past, present or future health status or care or the provision of or payment for that health care. We need this record to provide you with quality care and to comply with certain legal requirements.

This notice applies to all of the records of your care created or retained by CRMC, whether made by CRMC personnel or your personal doctor."[4]

17. CRMC acknowledges that it is "required by law to maintain the privacy of protected health information" and "to notify [patients] in case of a breach of your protected health information."[5]

18. In addition, CRMC assures patients that their sensitive information will be treated as confidential. Specifically, CRMC's Patient Bill of Rights provides that patients have the right to expect that "all communications and records pertaining to care will be treated as confidential and protected."[6] CRMC further represents that patients are entitled to personal privacy, secure handling of their medical information, and protection against unauthorized disclosure of their records.

19. Plaintiff and Class members are current or former patients of Defendant, or are otherwise affiliated with Defendant, and entrusted Defendant with their sensitive Personal Information and confidential medical records.

20. Plaintiff and Class members, as current and former patients, or persons otherwise affiliated with Defendant, relied on Defendant to keep their sensitive Personal Information confidential and securely maintained, to use this information for business purposes only, and to make certain only authorized disclosure of this information.

---

[4] *CRMC, Notice of Privacy Practices*, https://crmchealth.org/privacy-practices/ ((last visited Apr. 23, 2026).
[5] *Id.*
[6] CRMC, *Patient Bill of Rights and Responsibilities* (Form 857, rev. June 2023), https://www.crmchealth.org/wp-content/uploads/2025/12/Form-857-Bill-of-Rights-ENGLISH-rev.-6-23.pdf (last visited Apr. 23, 2026).

***The Data Breach***

21. On or about April 14, 2026, CRMC reported that it experienced a cybersecurity incident whereby "an unauthorized third party accessed CRMC's computer network and viewed and/or acquired certain files between July 11, 2025, and July 14, 2025."[9] According to the Notice published on CRMC's website, upon discovering the incident, "CRMC promptly began an internal investigation, worked to secure its systems, and notified law enforcement. CRMC also engaged a forensic security firm to assist with its investigation and ensure the security of its computer network."[10]

22. CRMC claims that it completed its investigation on or about March 16, 2026. CRMC's investigation determined that the Personal Information compromised and accessed by unauthorized third parties in the Data Breach include names, addresses, dates of birth, Social Security numbers (SSN), driver's license numbers, financial information, medical treatment information, medical record numbers, and/or health insurance policy information of approximately 337,917 individuals.[7]

23. Despite learning of the Data Breach as early as July 14, 2025, CRMC did not publicly announce the Data Breach until approximately nine months later, in or around April 2026, and did not begin sending out Data Breach notification letters to affected individuals until around that time.

24. CRMC provides scant detail about the Data Breach and the steps that CRMC is taking to address it. It merely stated that it "has taken, and is taking, additional steps to help reduce

[7] CRMC, *Data Breach Notification*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/fb04ea66-92bb-4a15-b02c-8d1a9f783461.html (last visited Apr. 23, 2026).

the likelihood of a similar event from happening in the future, including by enhancing its technical security measures."

25. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class members such as encrypting the information or deleting it when it is no longer needed.

26. Upon information and belief, Plaintiff's and Class members' Personal Information was compromised and acquired in the Data Breach, and their privacy has been jeopardized.

27. As evidenced by the Data Breach's occurrence, the Personal Information contained in Defendant's systems was not adequately protected from intrusions. Had the information been properly secured consistent with industry standards and best practices, data thieves would have exfiltrated only unintelligible data.

28. Plaintiff further believes that his PII/PHI, and that of Class members, was subsequently published or sold on the dark web following the Data Breach, given the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

***Defendant Knew That Criminals Target PII/PHI***

29. At all relevant times, Defendant knew, or should have known, its patients' and other affiliated individuals' PII/PHI, such as Plaintiff's and all other Class members' PII/PHI, was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that Defendant should have anticipated and guarded against.

30. It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as Social Security numbers ("SSNs") and medical information—is valuable and frequently targeted by criminals. Indeed, "[d]ata breaches are on the

rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[8]

31. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2021 report, the healthcare compliance company Protenus found that there were 758 medical data breaches in 2020 with over 40 million patient records exposed.[9] This is an increase from the 572 medical data breaches that Protenus compiled in 2019.[10]

32. PII/PHI is a valuable property right.[11] The value of PII/PHI as a commodity is measurable.[12] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[13] American companies spend many billions of dollars on acquiring personal data of consumers.[14] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

8 Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

9 Protenus, *2021 Breach Barometer*, PROTENUS.COM, available at https://www.protenus.com/resources/2021-breach-barometer (last accessed Oct. 5, 2023).

10 Protenus, *2020 Breach Barometer*, PROTENUS.COM, available at https://www.protenus.com/resources/2020-breach-barometer (last accessed Oct. 5, 2023).

11 *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

12 *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

13 OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD LIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last accessed Oct. 5, 2023).

14 IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018),

33. As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

34. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[15] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[16] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[17]

35. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[18] According to a report released by the Federal Bureau of Investigation's

---

https://www.iab.com/news/2018-state-of-data-report/ (last accessed Oct. 5, 2023) (estimated to have spent over $19 billion in 2018).

[15] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[16] *Id.*

[17] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[18] SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last accessed Oct. 5, 2023).

("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[19]

36. John Riggi, the American Hospital Association National Advisor for Cybersecurity and Risk, said "foreign cyber gangs and spies" were testing the resilience of hospitals especially as hospitals began to fill up at the time because of the "tripledemic" including increased cases of RSV, flu and COVID-19.[20]

37. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[21] Quoting Carbon Black's Chief Cybersecurity Officer, one article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[22]

38. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

---

[19] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last accessed Oct. 5, 2023).

[20] Dan Alexander, *Personal Data of 617,000 Patients Exposed in NJ Hospital Cyberattack*, NEW JERSEY 101.5 (Feb. 13, 2023), https://nj1015.com/personal-data-of-617000-patients-exposed-in-nj-hospital-cyberattack/.

[21] *What Happens to Stolen Healthcare Data*, *supra* at n. 23.

[22] *Id.*

[23] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

39. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

40. Theft of PII/PHI is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[24]

41. Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[25] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[26]

---

[24] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Oct. 5, 2023).

[25] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[26] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

42. With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits, or; filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[27]

43. Identity theft is a very difficult problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[28]

44. Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. To obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

45. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to

---

[27] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Oct. 5, 2023).

[28] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Oct. 5, 2023).

find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[29]

46. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[30] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[31] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [32] The FTC also warns, "If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[33]

47. For these reasons, the information compromised in the Data Breach is significantly more valuable than the loss of basic financial information, because there, victims can cancel or close credit or debit card accounts. Upon information and belief, the information compromised by the Data Breach—for example, a Social Security number—is exceedingly difficult, if not impossible, to change.

---

[29] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[30] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf.

[31] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* at n.27.

[32] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Oct. 5, 2023).

[33] *Id*.

48. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.
- Significant bills for medical goods and services not sought nor received.
- Issues with insurance, co-pays, and insurance caps.
- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.
- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.
- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.
- Phantom medical debt collection based on medical billing or other identity information.
- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[34]

49. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[35]

50. It is within this context that Plaintiff and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the

---

[34] *See The Geography of Medical Identity Theft*, *supra* at n.38.

[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Defendant Fails to Comply With Industry Standards***

51. Cyber security experts routinely identify healthcare entities in possession of PII/PHI as being particularly vulnerable to cyberattacks because of the value of the information which they collect and maintain.

52. As a result, several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of PII/PHI, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

53. Defendant failed to follow, enforce, or maintain the aforementioned best practices. Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

***Damages Sustained by Plaintiff and the Other Class Members***

54. Plaintiff and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—risks justifying

expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

55. Plaintiff had a reasonable expectation of privacy in his sensitive PII/PHI while receiving medical treatment and/or health related services. Plaintiff would not have agreed to have his sensitive PII/PHI provided to and maintained by Defendant had he known that Defendant would fail to adequately protect his PII/PHI. Indeed, Plaintiff sought medical treatment and/or health related services through Defendant with the reasonable expectation that Defendant would keep his PII/PHI secure and inaccessible to unauthorized parties. Plaintiff and Class members would not have obtained services from Defendant had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard PII/PHI from criminal theft and misuse.

56. Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

57. As a result of Defendant's failures, Plaintiff and Class members are also at substantial and certainly impending increased risk of suffering identity theft and fraud or misuse of their PII/PHI. Indeed, Plaintiff's damages are not merely speculative. Consequently, Plaintiff and Class members now face a substantially increased risk of identity and medical theft that is plausibly imminent, considering the actual instances of fraud already suffered by other Class members.

## CLASS ALLEGATIONS

58. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

59. Plaintiff brings this action individually and on behalf of all members of the following Class of similarly situated persons:

> **Nationwide Class**
> All individuals residing in the United States whose PII/PHI was accessed by and disclosed to unauthorized persons as a result of the Data Breach.
>
> **Tennessee Subclass**
> All individuals residing in Tennessee whose PII/PHI was accessed by and disclosed to unauthorized persons as a result of the Data Breach.

60. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

61. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

62. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

63. While the precise number of Class members has not yet been determined, the members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Upon information and belief, the Data Breach affected tens of thousands of individuals who are geographically dispersed.

64. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

c. Whether an implied contract existed between Class members and Defendant providing that Defendant would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

d. Whether Defendant breached its duties to protect Plaintiff's and Class member's PII/PHI; and

e. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

65. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and Class members. Individual questions,

if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

66. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

67. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that Plaintiff has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

68. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and the Nationwide Class or, alternatively, the Tennessee Subclass)

69. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

70. Defendant owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

71. Defendant knew the risks of collecting and storing Plaintiff's and Class members' PII/PHI and the importance of maintaining secure systems. Defendant knew of the many data breaches that targeted businesses that collect sensitive PII/PHI in recent years.

72. Given the nature of Defendant's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, Defendant should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

73. Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

74. It was reasonably foreseeable to Defendant that failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would

result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

75. But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

76. Defendant's duties also arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

77. Defendant's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendant, of failing to employ reasonable measures to protect and secure PII/PHI.

78. Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and Class members' PII/PHI and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

79. In addition, applicable state laws require healthcare providers to maintain the confidentiality of medical records and communications.

80. Defendant violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI

and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

81. In addition to its negligence, Defendant's violation of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

82. Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

83. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and all other Class members as a result of the Data Breach.

84. It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

85. As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care, and its negligence and negligence per se, that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, economic

damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face. In addition, Class members already have suffered actual fraud, identity theft, and medical theft as alleged herein, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class members.

## COUNT II
## BREACH OF FIDUCIARY DUTY
**(On behalf of Plaintiff and the Nationwide Class or, alternatively, the Tennessee Subclass)**

86. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87. Plaintiff and Class members provided Defendant their PII/PHI in confidence, believing that Defendant would protect that information. Plaintiff and Class members would not have provided Defendant with this information had they known it would not be adequately protected. Defendant's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Defendant, on the one hand, and Plaintiff and Class members, on the other hand. In light of this relationship, Defendant must act primarily for the benefit of its patients and clients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

88. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. Defendant breached that duty by failing to properly protect the integrity of its systems containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected.

89. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach. In addition, upon information and belief, Class members already have suffered actual fraud, identity theft, and medical theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
**(On behalf of Plaintiff and the Nationwide Class or, alternatively, the Tennessee Subclass)**

90. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. In connection with receiving medical treatment and/or health related services, Plaintiff and Class members entered into implied contracts with Defendant.

92. Pursuant to these implied contracts, Plaintiff and Class members provided Defendant with their PII/PHI. In exchange, Defendant agreed to, among other things, and Plaintiff understood that Defendant would: (1) provide medical treatment and health related services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

93. The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Defendant, on the other hand. Indeed, as set forth *supra*, Defendant recognized the importance of data security and the privacy of its patients' PII/PHI in, *inter alia*, its HIPAA Notice of Privacy Practices. Had Plaintiff and Class members known that Defendant would not adequately protect its patients' PII/PHI, they would not have obtained medical treatment or services from Defendant.

94. Plaintiff and Class members performed their obligations under the implied contract when they provided Defendant with their PII/PHI and paid—directly or through their insurers—for medical treatment and health related services from Defendant.

95. Defendant breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

96. Defendant's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and Class members have suffered from the Data Breach.

97. Plaintiff and Class members were damaged by Defendant's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT IV**
**INVASION OF PRIVACY/INTRUSION UPON SECLUSION**
**(On behalf of Plaintiff and the Nationwide Class or, alternatively, the Tennessee Subclass)**

98. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

99. Plaintiff and Class members had a reasonable expectation of privacy in the PII/PHI that Defendant disclosed without authorization.

100. Defendant's conduct intruded upon Plaintiff's and Class members' seclusion under common law.

101. By failing to keep Plaintiff's and Class Members' PII/PHI safe, knowingly employing inadequate data privacy policies and protocols, and disclosing PII/PHI to unauthorized parties for unauthorized use, Defendant unlawfully invaded Plaintiff's and Class Members' privacy by, *inter alia*:

a. intruding into Plaintiff's and Class members' private affairs in a manner that would be highly offensive to a reasonable person;

b. invading Plaintiff's and Class members' privacy by improperly using their PII/PHI properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

c. failing to adequately secure PII/PHI from disclosure to unauthorized persons; and

d. enabling the disclosure of Plaintiff's and Class members' PII/PHI without consent.

102. Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and Class members' position would consider their actions highly offensive.

103. Defendant knew that its IT systems and servers were vulnerable to data breaches prior to the Data Breach.

104. Defendant invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by disclosing their PII/PHI to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

105. As a proximate result of such unauthorized disclosures, Plaintiff's and Class members' reasonable expectations of privacy in their PII/PHI was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

106. In failing to protect Plaintiff's and Class members' PII/PHI, and in disclosing Plaintiff's and Class members' PII/PHI, Defendant acted with malice and oppression and in conscious disregard of Plaintiff's and Class members' rights to have such information kept confidential and private.

107. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT V**
**VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT,**
**Tenn. Code. Ann § 47-18-101, *et seq.***
**(On behalf of Plaintiff and the Tennessee Subclass)**

108. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

109. Plaintiff brings this count on behalf of the Tennessee Subclass.

110. Tenn. Code Ann. § 47-18-109(a)(1) provides that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damage."

111. Tenn. Code Ann. § 47-18-109(a)(3) further provides that "[i]f the court finds that the use or employment of the unfair or deceptive act or practice was willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper…"

112. Defendant's conduct described herein violates the Tennessee Consumer Protection Act because Defendant engaged in the deceptive acts and practices with respect to its services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting the PII/PHI of Plaintiff and the Class with knowledge that the information would not be adequately protected; and by storing the PII/PHI of Plaintiff and the Class in an unsecure environment in violation of HIPAA and the rules and regulations promulgated thereunder,

including 42 U.S.C. § 1301, *et seq*., 45 C.F.R. §§ 164.400-414, and 45 C.F.R. § 164.306, *et seq*. (as alleged *supra*.); and in violation of the Federal Trade Commission Act, 15 U.S.C. § 45 and 17 C.F.R. § 248.201, which require Defendant to employ reasonable methods of safeguarding the PII/PHI of Plaintiff and the Class.

113. Defendant omitted material facts concerning the steps they took (or failed to undertake) to protect Plaintiff's Tennessee Subclass Members' Personal Information, which were deceptive, false and misleading given the conduct described herein. Such conduct is inherently and materially deceptive and misleading in a material respect, which Defendant knew, or by the exercise of reasonable care, should have known, to be untrue, deceptive or misleading. Such conduct is unfair, deceptive, untrue, or misleading in that Defendant: (a) represented that its services have approval, characteristics, uses or benefits that they do not have; and (b) represented that its services are of a particular standard, quality or grade.

114. Defendant's materially misleading statements and deceptive acts and practices alleged herein were directed at the public at large.

115. Defendant's actions impact the public interest because Plaintiff and the Tennessee Subclass have been injured in exactly the same way as thousands of others as a result of and pursuant to Defendant's generalized course of deception as described throughout this Complaint.

116. Defendant's acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances.

117. Defendant's misrepresentations, misleading statements and omissions were materially misleading to Plaintiff and members of the Tennessee Subclass.

118. Defendant's violation of Tenn. Code Ann. § 47-18-104 was willful and knowing. As described above, at all relevant times, Defendant, among other things, knew that its policies

and procedures for the protection of Plaintiff's and the Tennessee Subclass' Personal Information were inadequate to protect that Personal Information. Nonetheless, Defendant continued to solicit and process Personal Information in the United States in order to increase their own profits.

119. Had Plaintiff and the members of the Tennessee Subclass known of Defendant's misrepresentations, misleading statements and omissions about its use of Personal Information, they would not have sought medical treatment or health related services from Defendant.

120. As a direct and proximate result of Defendant's conduct in violation of Tenn. Code Ann. § 47-18-104, Plaintiff and the members of the Tennessee Subclass have been injured in amounts to be proven at trial.

121. Plaintiff and the Tennessee Subclass seek relief under Tenn. Code Ann. §§ 47-18-104 and 47-18-109, including, but not limited to, restitution to Plaintiff and the Class of money or property that Defendant may have acquired by means of Defendant's deceptive and unlawful business practices, restitutionary disgorgement of all profits accruing to Defendant because of Defendant's deceptive and unlawful business practices, treble damages, declaratory relief, attorneys' fees and costs and injunctive or other equitable relief.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class or, alternatively, the Tennessee Subclass)**

122. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

123. This claim is pleaded in the alternative to the breach of implied contract claim.

124. Plaintiff and Class members conferred a monetary benefit upon Defendant in the form of monies paid for medical and health related services.

125. Defendant accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Defendant also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this information was used facilitate payment and make insurance claims.

126. As a result of Defendant's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

127. Defendant should not be permitted to retain the money belonging to Plaintiff and Class members because Defendant failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

128. Defendant should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of its conduct and Data Breach alleged herein.

## COUNT VII
## DECLARATORY RELIEF
**(On behalf of Plaintiff and the Nationwide Class, or, alternatively, the Tennessee Subclass)**

129. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

130. The Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, authorizes courts to declare rights, status, and other legal relations so as to afford litigants relief from uncertainty and insecurity.

131. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective duties to reasonably safeguard Plaintiff's and Class members' PII/PHI, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from future data breaches that compromise their PII/PHI.

132. The Data Breach evidences Defendant's failure to provide security measures that were adequate, reasonable, and/or compliant with industry standards and best practices with regard to safeguarding Plaintiff's and Class members' PII/PHI.

133. The Data Breach demonstrates that its systems are vulnerable to unauthorized access, and more stringent measures must be taken to safeguard the PII/PHI of Plaintiff and the Class members going forward.

134. Plaintiff seeks a declaration that Defendant's current security measures are inadequate to safeguard PII/PHI, do not comply with its obligations to keep PII/PHI secure, and that Defendant must implement specific additional security practices to provide reasonable protection and security for the PII/PHI it maintains, including the PII/PHI of Plaintiff and Class members.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: April 23, 2026

*/s/: Alexandra M. Honeycutt*

Alexandra M. Honeycutt
**MILBERG PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (423) 737-3265
ahoneycutt@milberg.com

Tina Wolfson (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505-4521
Tel (310) 474-9111
Fax (310) 474-8585
twolfson@ahdootwolfson.com

Bradley K. King (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: (917) 336-0171
Facsimile: (917) 336-0177
bking@ahdootwolfson.com

*Counsel for Plaintiff and Proposed Class*